NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

MBA DEVELOPMENT PARTNERS LLC,
*Plaintiff/Appellant*,

*v.*

CITY OF SCOTTSDALE, et al.,
*Defendants/Appellees*.

No. 1 CA-CV 19-0309
FILED 8-25-2020

---

Appeal from the Superior Court in Maricopa County
Nos. CV 2017-015460
LC 2017-000454-001
(Consolidated)
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

---

COUNSEL

Jennings, Strouss & Salmon, PLC, Phoenix
By John J. Egbert
*Co-Counsel for Plaintiff/Appellant*

Davidson & Kaffer, PLLC, Scottsdale
By Frederick E. Davidson, Chad R. Kaffer
*Co-Counsel for Plaintiff Appellant*

Scottsdale City Attorney's Office, Scottsdale
By Eric C. Anderson, Stephanie Heizer
*Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Jennifer B. Campbell[1] joined and Judge D. Steven Williams dissented.

---

**B R O W N**, Judge:

¶1        MBA Development Partners, LLC ("MBA") appeals the superior court's judgment affirming a decision of the City of Scottsdale Board of Adjustment ("Board"), which upheld the Zoning Administrator's ("Administrator") interpretation of a 1994 zoning ordinance approving a planned development.  Because the Administrator's interpretation is the only reasonable reading of the ordinance, we affirm.

**BACKGROUND**

¶2        MBA owns undeveloped real property ("Parcel 6") in the Troon North development area of Scottsdale.  That area surrounds the Troon North Golf Course and was originally part of a 2,500-acre master plan the City approved in the 1980s.  In 1994, the Scottsdale City Council adopted a resolution amending the general plan to make technical changes to the land use plan map but maintained the original intent of the plan for the 55 acres of land surrounding the golf course.  At the same time, the City Council adopted an ordinance changing the zoning from single family residential and dividing the land into six parcels, with future development, including resorts, conditioned upon various zoning stipulations.  Stipulation 2 listed, among other things, the acreage, maximum density, and maximum unit counts for each parcel.  Notably, though, the acreage listed in Stipulation 2 was incorrect on several of the parcels, and as most pertinent here, Parcel 6.  The acreage for Parcel 6 was arguably correct on the City's conceptual site plan, but not in Stipulation 2.  The City Council

---

[1]        Judge Jennifer B. Campbell replaces the Honorable Kenton D. Jones, who was originally assigned to this panel.  Judge Campbell has read the briefs, reviewed the record, and watched the recording of the oral argument.

was made aware of the incorrect figures, but nonetheless approved the zoning amendment with the incorrect acreages.

¶3        Parcels 1 through 5 were essentially developed with single family residences, leaving the parcel at issue here, Parcel 6, the last undeveloped parcel of land. Stipulation 2 listed Parcel 6's acreage as 1.49, rather than the actual 2.56,[2] and listed a maximum number of residential units as 22, which equates to 31 resort units.[3] In 2016, MBA acquired Parcel 6. Later that year, MBA submitted a plan to the City's Development Review Board for approval to build 64 resort units. As part of its initial review, City staff asked for clarification as to how MBA calculated its proposed unit count. MBA clarified that it was basing its count on the total number of units that should still have been allowed under Stipulation 2 after taking into account the housing density implemented in Parcels 1 through 5, rather than Stipulation 2's specific unit counts and density for Parcel 6 as drafted in 1994.[4]

---

[2]        The precise acreage of Parcel 6 continues to be a point of disagreement between the parties, but the actual acreage is ultimately immaterial to our decision.

[3]        Residential units and resort units do not directly equate. The underlying zoning standards for the parcels provide that resort units require a minimum gross land area of 4,100 square feet and residential units require a minimum gross land area of 5,770 square feet. Though Stipulation 2 allows the parcels to depart from these square footage requirements, the City Council still based Stipulation 2 on ratios from the underlying zoning. Thus, the ratio of resort units to residential units can be rounded to 1.41, which is how the Administrator used and interpreted the ratio as being 1.41. However, a ratio of 1.43 is occasionally used; for example, the text of Stipulation 2, *see infra* ¶ 7, provides that 385 residential units equates to 550 resort units, which can be rounded to a ratio of 1.43. City staff also interpreted the ratio as 1.43 in the first review comments of MBA's proposed developments. In either case, 22 residential units can be rounded to 31 resort units (22 x 1.41 = 31.02; 22 x 1.43 = 31.46).

[4]        According to MBA's calculations, Stipulation 2, *see infra* ¶ 7, simply provides the maximum number of residential units allowed among all the parcels. MBA determined that the number of units actually built on parcels 1 through 5 equals 341 residential units, meaning there are 44 residential units remaining to reach the threshold of 385 residential units. MBA then

¶4        MBA continued through the review process for its proposed development, and City staff made no mention of the proposed unit count in the second review comments.  By 2017, Troon North Association, the homeowners' association for the development area, requested an interpretation of the zoning ordinance from the Administrator, seeking clarity as to the unit counts allowed on Parcel 6.  In response, the Administrator issued a letter interpreting the ordinance to mean the maximum unit count allowed on Parcel 6, regardless of discrepancies related to the actual acreage, was 22 units (or 31 resort units), as provided in Stipulation 2.  The Administrator discussed Stipulation 2 and its table in detail.  He also accounted for the history of the land, the other relevant conditions for building on Parcel 6, and explained how the developments on parcels 1 through 5 factored into his conclusion.  He concluded that Stipulation 2's table "specifically indicates what the maximum densities for the 6 parcels are, including the <u>maximum</u> number of dwelling units[,] and Parcel 6 is currently allowed 22 dwelling units or 31 resort rooms"; thus, exceeding those densities would require approval by the City Council through a separate hearing process.

¶5        MBA appealed the Administrator's interpretation to the Board of Adjustment, and after a hearing in November 2017, the Board affirmed.  Both Troon North Association and MBA challenged the Board's decision by separately commencing special action proceedings in the superior court.  The Association alleged that none of the units built on Parcel 6 could be resort units, and MBA asserted it should be allowed to build 48 resort units with 62 resort rooms.[5]  The court consolidated the cases and later dismissed the Association's petition for lack of standing but allowed the Association to participate as amicus curiae.  Following oral argument, the court affirmed the decision of the Board, explaining in part that (1) the zone change stipulations "set the maximum densities per parcel and the maximum units per parcel" with a mechanism for redistribution of densities subject to staff approval, and (2) read holistically, the plain language of the ordinance is consistent with the Administrator's

---

multiplied the 44 residential units by the ratio of residential units to resort units (MBA used 1.43, *see supra* n.3).  This results in 62.92 resort units, which MBA apparently rounded to 64 resort units in its initial proposal.

[5]        MBA also alleged the Board abused its discretion by failing to consider MBA's vested rights and the impact of the doctrine of equitable estoppel.  Those issues have not been raised on appeal.

interpretation that the maximum number of resort units for Parcel 6 is 31, absent staff approval of a redistribution.  MBA timely appealed.

## DISCUSSION

¶6        Our standard of review requires us to determine if the Board's decision was arbitrary and capricious or an abuse of its discretion.  *Murphy v. Town of Chino Valley*, 163 Ariz. 571, 574 (App. 1989).  But insofar as we review issues of statutory interpretation, we review de novo and are free to draw our own legal conclusions.  *Id.*

¶7        Stipulation 2 provides for zoning of all the parcels surrounding the golf course, including Parcel 6:

> Maximum densities and dwelling unit counts shall be as indicated on the approved development plan except that in no case shall [the] unit count exceed 385 (for units which are not used or available as resort rooms) and 424 units maximum (of which at least 90 units shall be used as resort rooms) without a subsequent public hearing.  The specific location of each parcel shall be determined at the time of site plan review.  Redistribution of the units is subject to maximum densities and Project Coordination staff approval.  All such requests shall include a revised master development plan and a revision to the table on page 2 indicating the parcels with the corresponding reduction/increase.

| Parcel | Gross Acres | Zoning | Proposed DU/AC | Max. DU/AC | Proposed # Units | Max. # Units |
|--------|-------------|--------|----------------|------------|------------------|--------------|
| 1 | 14.68 | R4-R HD | 7/ac | 7/ac | 100 | 100 |
| 2 | 12.40 | R4-R HD | 8/ac | 8/ac | 100 | 100 |
| 3 | 10.20 | R4-R HD | 7/ac | 7/ac | 72 | 72 |
| 4 | 10.00 | R4-R HD | 10/ac | 10/ac | 99 | 99 |
| 5 | 3.42 | R4-R HD | 10/ac | 10/ac | 31 | 31 |
| 6 | 1.49 | R4-R HD | 15/ac | 15/ac | 22 | 22 |
| Total | 52.19 | | 7.7/ac | | 424 | 385/424* |

> *The proposed unit count of 424 represents a mix of residential and resort units.  The 385 unit maximum is the maximum allowed for residential units.  If the residential units were all converted to resort units the maximum would be 550 units.

¶8          We interpret the 1994 zoning ordinance using the "same rules and principles governing the construction of statutes," with the primary goal of ascertaining and giving effect to the intent of the City Council. *Abbott v. City of Tempe*, 129 Ariz. 273, 275 (App. 1981). Intent is most clear from the ordinance's plain language, considered in proper context. *Glazer v. State* (*Glazer II*), 244 Ariz. 612, 614, ¶¶ 9–10 (2018). To determine whether an ordinance is ambiguous, we look to whether it is open to multiple reasonable interpretations or whether its meaning is not evident after examining the context as a whole. *Id.* at ¶ 12. "If the [ordinance] is subject to only one reasonable interpretation, we apply it without further analysis," *Glazer v. State* (*Glazer I*), 237 Ariz. 160, 163, ¶ 12 (2015), unless the results are absurd or impossible. *Bilke v. State*, 206 Ariz. 462, 464, ¶ 11 (2003). Disagreement by the parties as to the meaning of an ordinance does not render it ambiguous. *Glazer II*, 244 Ariz. at 614, ¶ 12. Here, both MBA and the City argue the ordinance is unambiguous and can only be interpreted in the manner each party suggests.

### A.    The Administrator's Interpretation is Most Consistent with the Table

¶9          MBA's primary argument that the Administrator's interpretation is incorrect is based on flawed assumptions about the acreage and how the number of units was calculated under Stipulation 2. MBA argues the Administrator can and should plug in the actual acreage—which it now argues is 3.17—for Parcel 6, multiply that acreage by the maximum dwelling units per acre of 15, and obtain a new maximum number of units. This argument relies on the theory that the maximum number of residential units, 22, is merely a product of multiplying the gross number of acres by the maximum acreage, and the density column containing 15 dwelling units per acre is the only fixed column.[6] While that appears to be the case on the

_____

[6]     To support this interpretation, at the Board hearing MBA provided testimony from a former senior planner for the City who was employed by the City at the time the ordinance was drafted. But because the ordinance is unambiguous, we have no reason to look to secondary factors such as this testimony. *See Premier Physicians Grp., PLLC v. Navarro*, 240 Ariz. 193, 195, ¶ 9 (2016) ("When a statute is ambiguous, we determine its meaning by considering secondary factors, such as the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose."). And because we view the Administrator's interpretation as the only reasonable interpretation, we do not address MBA's or the City's alternative arguments relating to secondary statutory interpretation tools

surface, we cannot conclude the table in Stipulation 2 derives its numbers based solely on a math calculation.

¶10    Parcel 5 in particular illustrates that, though the numbers in the table correlate somewhat with multiplication, the totals are not direct results of the math. Thus, the City Council must have used multiple factors in choosing each parcel's maximum densities rather than relying on a pure mathematical formula. But even if the table were based on such a formula, nothing in the plain language of Stipulation 2 empowers the Administrator to simply insert numbers and perform new calculations. And nothing in the table or in the text of Stipulation 2 indicates that density is the only fixed number in the table. *See infra* ¶¶ 15–16.

¶11    MBA argues the Administrator's position cannot stand because it renders other numbers in Stipulation 2's table as surplusage. But our charge is to avoid surplusage if possible; in the case of this ordinance, surplusage is impossible to avoid. *See Ariz. State Univ. Bd. of Regents v. Ariz. State Ret. Sys.*, 242 Ariz. 387, 389, ¶ 7 (App. 2017) ("We interpret statutes to *avoid* rendering 'any of its language mere "surplusage". . . .'" (emphasis added) (citation omitted)). If, as MBA suggests, the proper acreage were inserted into the table and multiplied by the maximum density per acre to yield a new maximum number of units, the listed maximum number of residential units, 22, would be surplusage. But if the ordinance is read as-is, Parcel 6's listed acreage is surplusage because it is incorrect. And under MBA's multiplication-based interpretation, Parcel 5's listed maximum density would also be surplusage, because the maximum number of units for that parcel and acreage do not allow the parcel to actually meet the listed maximum density. Accordingly, an analysis of what portions of the zoning ordinance may or may not be rendered surplusage is not a useful metric for us to analyze the ordinance.

¶12    Further, MBA's interpretation would disregard the plain meaning of the word "maximum" used in Stipulation 2's table. The number of units MBA seeks to build is substantially more than 22 residential or its corresponding 31 resort units, and thus it would violate the maximum of 22/31 units listed in the table. By contrast, the Administrator interpreted the number of units allowed as the same as what the table listed — 22 dwelling units or 31 resort units. Because the table only sets maximums,

based upon a finding of ambiguity. For the same reason, we do not consider earlier interpretations of the ordinance made in connection with development plans submitted by the prior owners of Parcel 6.

rather than minimums, there is no corresponding violation of the total number of dwelling units when the ordinance is interpreted as allowing 22 dwelling units. Given the true acreage of Parcel 6, we acknowledge that the proposed density of 15 dwelling units per acre cannot be met; but because 15 dwelling units per acre is a *maximum*, nothing in the table conflicts with allowing a lesser density.[7] We do not read the table as being controlled solely by the maximum density *or* the maximum unit counts. Rather, we will attempt to harmonize as much of the table as possible, and reading the table as subject to *both* maximums is the only reasonable reading.

¶13 The City Council that approved the ordinance clearly contemplated Parcel 6 having a maximum of 22 units; we find nothing absurd or impossible in an interpretation that is consistent with the maximum number of units on Parcel 6, plainly stated in Stipulation 2. As long as our interpretation of the ordinance is not absurd or impossible, we will apply it. *See State Tax Comm'n v. Television Servs., Inc.*, 108 Ariz. 236, 239 (1972) ("Where the meaning of a statute does not lead to an impossibility or an absurdity such as could not have been contemplated by the Legislature, courts follow that meaning even though the result may be harsh, unjust, or a mistake in policy."). Thus, the Administrator's interpretation that Stipulation 2 only allows 22 units is the only reasonable reading of the table.

### B. The Administrator's Interpretation is Consistent with the Text of Stipulation 2

¶14 MBA argues the Administrator's interpretation is inconsistent with the text of Stipulation 2. First, MBA points to Stipulation 2's statement that "[t]he specific location of each parcel shall be determined at the time of site plan review," as indicating that parcel sizes would change. But this requires reading the word "location" as synonymous with the word "size." Black's Law Dictionary defines "location" as "[t]he specific place or position of a person or thing"; accordingly, it would be inappropriate to read the word "location" as indicating anything more than the specific site of the physical boundaries of the parcel. *Location*, Black's Law Dictionary (11th ed. 2019). The drafters may have contemplated that the actual boundaries of each parcel could differ slightly on the ground in comparison to on paper, but this does not indicate that the drafters intended the gross acreage

---

7   As written in Stipulation 2's table, this is also true for Parcel 5.

of the parcels to change. The fact that Parcel 6 could have a maximum of 22 units does not render this allowance meaningless.

¶15 Next, MBA points to Stipulation 2's allowance for a "redistribution of units" as evidence that Parcel 6's unit allocation could change. But this phrase does not indicate a possible wholesale departure from the table or Parcel 6's maximums; it must be read in conjunction with the table. And indeed, this only allows changes in a *specific condition*—when there is to be redistribution among multiple parcels. Nothing in the record indicates redistribution was ever requested by the owner of any of the six parcels, and thus the redistribution provision has no applicability here. To be sure, the provision indicates that redistribution is subject to "maximum densities," which could be read as an indication that the drafters of the ordinance viewed density as the most critical factor in Stipulation 2's table. But the plain language only indicates that density is a critical factor in the case of redistribution; nothing in the text of Stipulation 2 requires, or even suggests, the inference that density is *always* the controlling factor in the development. Further, it is unclear which "maximum densities" this sentence is referring to, because the provision itself would violate the table in Stipulation 2, even if density were the fixed column in the table.[8] We do not view the distribution provision as dictating that maximum densities is the fixed column in the table.

¶16 Finally, MBA argues Stipulation 2's statement that "maximum densities and dwelling unit counts shall be as indicated on the approved development" means there is built-in flexibility to the ordinance. But this sentence fragment must be examined in context of the entire sentence:

> Maximum densities and dwelling unit counts shall be as indicated on the approved development plan except that in no case shall [the] unit count exceed 385 (for units which are

---

[8] If a redistribution were used to increase the unit count for a parcel, the increase would, by definition, violate the maximum density per acre set in the table. For example, the actual development on Parcel 1 is 86 units, but the maximum number of units allowed in the table is 100. So if the owner of Parcel 2 sought to increase the maximum unit count available (100 units) by redistributing all or some of the 14 units from Parcel 1, Parcel 2's new unit count could be anywhere from 101 to 114 units. But this would yield a density per acre of 8.1 at a minimum and 9.2 at a maximum, violating the table's numbers. Thus, it is unclear how redistribution could be "subject to" the table's maximum densities.

not used or available as resort rooms) and 424 units maximum
(of which at least 90 units shall be used as resort rooms)
without a subsequent public hearing.

The sentence must also be read in conjunction with the rest of Stipulation 2; it allows densities and dwelling unit counts to change, but nothing in the plain language of the sentence allows departure from the maximums established elsewhere in the Stipulation. Therefore, the Administrator's interpretation that 22 residential units (or 31 resort units) is the maximum allowed is not inconsistent with this sentence. MBA also argues this sentence establishes an express requirement that 90 units be developed as resort units and the Administrator's interpretation reflects this requirement. But it is the present status of the parcels that eliminates this requirement; as the Administrator stated in his interpretation letter, "the originally-planned 90 resort units can no longer be achieved." And to that end, it may well be that if Parcel 6 were the first site developed in the area, a different interpretation as to the maximum allowed unit counts would be reasonable. But because of the structure of this ordinance, the completed developments on Parcels 1 through 5 have, of course, affected Parcel 6. Still, we view the Administrator's interpretation as the only reasonable interpretation under the circumstances.

### C. The Administrator's Interpretation is Consistent with Stipulation 12

¶17 MBA asserts the Administrator's interpretation is inconsistent with "other provisions of the ordinance." *See Stambaugh v. Killian*, 242 Ariz. 508, 509, ¶ 7 (2017) ("In construing a specific provision, we look to the statute as a whole and we may also consider statutes that are *in pari materia*—of the same subject or general purpose—for guidance and to give effect to all of the provisions involved."). MBA points only to Stipulation 12, however, and its statement that "[d]ensity will be based on the gross development area of each parcel." But "gross development area" is not the same as "gross acreage"; we read this statement as acknowledging that the area developed may not be the same as the total acreage of the parcel. Stipulation 1 contemplates this as well: "[T]he approved density for each parcel is subject to drainage, topography, NAOS requirements and other site planning concerns . . . . Appropriate design solutions to these constraints may preclude achievement of the proposed units or density on any or all parcels." And just because 22 residential units (or 31 resort units) are the maximum for Parcel 6 does not mean that density cannot be based on the gross development area; the density could always be less than Stipulation 2's provisions, and nothing about that would violate Stipulation

12.    Because MBA points to no other provisions with which the Administrator's interpretation is inconsistent, we conclude this interpretation is the only reasonable way to construe the zoning ordinance, and specifically, Stipulation 2. *See Premier Physicians Grp.*, 240 Ariz. at 195, ¶ 9 ("When possible, we seek to harmonize statutory provisions and avoid interpretations that result in contradictory provisions.").

**CONCLUSION**

¶18        We affirm the superior court's judgment affirming the Board's decision.

**W I L L I A M S**, J., dissenting

¶19        I respectfully dissent. Here we are tasked to interpret *de novo*, *Murphy*, 163 Ariz. at 574, a City of Scottsdale zoning ordinance described by Scottsdale during oral argument in the following manner: "The way the ordinance reads . . . it's a little weird, quite frankly." And, while I agree that the majority's interpretation of the ordinance is reasonable, I disagree that it is the only reasonable reading of the ordinance.

¶20        MBA's interpretation is also reasonable, and in my view, the more appropriate reading of the ordinance. As delineated, *supra* ¶ 7, and with limited exception discussed below, Stipulation 2 confines the development of each parcel to: (1) the "maximum densities" set forth in column five of Stipulation 2's table, and (2) the "dwelling unit counts" as set forth in column seven of the table.

| Parcel | Gross Acres | Zoning | Proposed DU/AC | Max. DU/AC | Proposed # Units | Max. # Units |
|---|---|---|---|---|---|---|
| 1 | 14.68 | R4-R HD | 7/ac | 7/ac | 100 | 100 |
| 2 | 12.40 | R4-R HD | 8/ac | 8/ac | 100 | 100 |
| 3 | 10.20 | R4-R HD | 7/ac | 7/ac | 72 | 72 |
| 4 | 10.00 | R4-R HD | 10/ac | 10/ac | 99 | 99 |
| 5 | 3.42 | R4-R HD | 10/ac | 10/ac | 31 | 31 |
| 6 | 1.49 | R4-R HD | 15/ac | 15/ac | 22 | 22 |
| Total | 52.19 | | 7.7/ac | | 424 | 385/424* |

Thus, I agree that, generally, Parcel 6 cannot be developed to a density greater than 15 dwelling units per acre and cannot comprise more than 22 total units. Further, according to the table, the collective number of units between all six parcels cannot exceed 385 "residential units," or 424 units comprised of "a mix of residential and resort units."

¶21 However, Stipulation 2 does allow a parcel to be developed in excess of the maximum number of units specified in column seven of the table subject to certain parameters. And, in my view, the majority's emphasis on column seven fails to adequately consider other crucial language of the ordinance vital to its interpretation. In particular, the following provisions must be noted when considering Stipulation 2's table:

> Maximum densities and dwelling unit counts shall be as indicated on the approved development plan *except that in no case shall [the] unit count exceed 385 (for units which are not used or available as resort rooms) and 424 units maximum (of which at least 90 units shall be used as resort rooms)* without a subsequent public hearing.
>
> . . .
>
> The proposed unit count of 424 represents a mix of residential and resort units. The 385 unit maximum is the maximum allowed for residential units. *If the residential units were all converted to resort units the maximum would be 550 units.*
>
> . . .
>
> Redistribution of the units is *subject to maximum densities* and Project Coordination staff approval.

(Emphasis added.) I read Stipulation 2 to identify two overarching requirements which the city council deemed absolute in the development of the six parcels. First, the total number of dwelling units combined between all six parcels cannot, absent a subsequent public hearing, exceed 385 residential units, *or* a mixture of residential and resort units totaling 424, *or* arguably 550 resort units.[9] Second, while dwelling units on any given parcel may exceed the maximum number set forth in column seven of the

---

[9] If MBA's proposed 62 resort units were developed, the total number of units combined among all six parcels would still be less than Stipulation 2's maximum of 424.

table, no parcel may be developed in excess of the density restrictions prescribed in column five of the table.

¶22        Further, it is beyond dispute that column two of the table, which sets forth the "gross acres" of each parcel: (1) *is not* accurate, (2) *was not* accurate when the ordinance was enacted, and (3) the city council *knew of the inaccuracies* but still chose to enact the ordinance with the following provision: "The specific *location* of each parcel shall be determined at the time of site plan review."(Emphasis added.)

¶23        As implied by the majority, "location" is not defined in the ordinance. The majority relies upon Black's Law Dictionary to define the same, *supra* ¶ 14, and concludes that, "[t]he drafters may have contemplated that the actual boundaries of each parcel could differ slightly on the ground in comparison to on paper, *but this does not indicate that the drafters intended the gross acreage of the parcels to change.*" (Emphasis added.) I respectfully disagree. Because the ordinance does not identify the location of any parcel, rather only lists gross acreage, in my view the majority's interpretation of "location" is too narrow. Certainly the drafter's caveat that "the specific location of each parcel *shall be determined at the time of site plan review*" contemplated a future determination of not just each parcel's "actual boundaries," as the majority concludes, but also contemplated a future determination of the land *within* those boundaries; which is to say, a parcel's gross acreage. (Emphasis added.) An August 2017 survey revealed the gross acreage of Parcel 6 to be 3.1707 acres, not the much smaller 1.49 acres listed in column two of the table.

¶24        The majority also points out, consistent with both Stipulation 1 and Stipulation 12, that "density," as set forth in column five of the table, "will be based on the gross development area of each parcel," and further notes that "'gross development area' is not the same as 'gross acreage.'" I agree. However, the portion of Parcel 6's gross acreage which qualifies as "gross development area" is not at issue before us. That matter is reserved for MBA and Scottsdale to determine.

¶25        Finally, the majority concedes its interpretation renders portions of the ordinance as surplusage. However, "we must read the [ordinance] as a whole and give meaningful operation to each of its provisions." *Ruiz v. Hull*, 191 Ariz. 441, 450, ¶ 35 (1998). "That is to say, we must avoid interpreting [an ordinance] so as to render any of its language mere 'surplusage,' but rather, must give meaning to 'each word, phrase, clause, and sentence . . . so that no part of the [ordinance] will be void, inert, redundant, or trivial.'" *Herman v. City of Tucson*, 197 Ariz. 430, 434, ¶14

(App. 1999) (quoting *Walker v. City of Scottsdale*, 163 Ariz. 206, 210 (App. 1989)).

¶26        Although I view MBA's reading of the ordinance to be the more reasonable interpretation, because the ordinance is open to more than one reasonable interpretation, it is, by definition, ambiguous. *See Glazer*, 244 Ariz. at 614, ¶ 12 (indicating a statute "is ambiguous when it is open to multiple reasonable interpretations"). "When a statute [or ordinance] is ambiguous, we determine its meaning by considering secondary factors, such as the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose." *Premier Physicians Grp.*, 240 Ariz. at 195, ¶ 9. When looking at secondary factors, we may accept prior administrative interpretation "where long continued and in cases of ambiguity." *City of Mesa v. Killingsworth*, 96 Ariz. 290, 296 (1964); *see also U.S. Parking Sys. v. City of Phoenix*, 160 Ariz. 210, 212 (App. 1989) (indicating we need not defer to a board of adjustment's interpretation when "there is no showing of a long-standing interpretation by the agency"). A review of Scottsdale's long-standing interpretation of the ordinance is beneficial and should be dispositive.

¶27        Before the Administrator's interpretation of the ordinance in 2017, nothing in the record indicates Scottsdale has interpreted the ordinance consistent with their position here. To the contrary, since its inception, Scottsdale has consistently interpreted the ordinance to more closely align with MBA's reading of the same.

¶28        In 1995, the year after the ordinance was amended, Scottsdale approved 35 resort units to be built on Parcel 6, more than the 31 resort units Scottsdale currently argues is the maximum allowed. It is unclear from the record what gross acreage was attributed to Parcel 6 at that time. Regardless, the approved project was never constructed.

¶29        In 2007, a previous owner of Parcel 6 submitted a proposal to the City's Development Review Board for the development of Parcel 6, which was determined to be approximately 2.5 acres at that time. Scottsdale acknowledged that 37 units were allowed and then unanimously approved the building of 48 *resort* units. Thus, Scottsdale must have generally agreed with MBA's calculations here that 37 dwelling units could have translated into, perhaps, as many as 52 resort units (2.5 acres x 15 dwelling units/acre = 37.5 dwelling units; 37 dwelling units x 1.43 = 52.91 resort units). Again, the approved project was never constructed.

¶30        In July 2016, MBA acquired Parcel 6. In October 2016, MBA submitted an application for a 64 resort unit development. In November

2016, as part of its first review comments, Scottsdale sought clarification from MBA noting that "37 units were historically allocated for use on this site" and requested MBA to explain how 37 dwelling units could be increased to 64 resort units. MBA responded and resubmitted the project plans in June 2017 seeking approval for 62 resort units. In July 2017, as part of its second review comments, Scottsdale made no further inquiry regarding number of units allowed on Parcel 6 and arguably intimated MBA's request was within the maximum number of units allowed when it directed MBA to modify the site plan to account for "three (3) [refuse enclosures] based on one enclosure per 20 units." That same month, a third-party opposing MBA's development requested that the Administrator interpret the ordinance. In August 2017, the Administrator issued an interpretation, and for the first time, Scottsdale took the position that Parcel 6 could not be developed in excess of "22 dwelling units or 31 resort units."

¶31 Scottsdale's long-standing treatment of the ordinance is more closely harmonized with MBA's reading of the ordinance than its own position here. Indeed, Scottsdale has historically interpreted the ordinance to allow the development of Parcel 6 subject to: (1) the gross acreage of Parcel 6, (2) the maximum density restrictions set forth in column five of the table, and (3) the combined dwelling units among all six parcels, comprised of a mixture of residential and resort units, totaling no more than 424. Any other reading of the ordinance is a clear deviation from Scottsdale's long-continued interpretation and results in an injustice to the property owner.

¶32 In my view, the Administrator's interpretation of the ordinance, and subsequent affirmation by both the Board and the superior court, should be vacated.

